## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KEVIN BRADSHAW, individually, and on behalf of all others similarly-situated, | ) ) ) | Case No.:   CIV-16-388-R |
| | ) | CIVIL CLASS ACTION |
| Plaintiff, | ) ) | |
| vs. | ) ) | *Jury Trial Demanded* |
| UBER TECHNOLOGIES, INC. and RASIER, LLC. | ) ) ) | |
| Defendants. | ) ) | |

### FIRST AMENDED COMPLAINT

Plaintiff Kevin Bradshaw ("Plaintiff" or "Mr. Bradshaw") alleges on behalf of himself and a class of those similarly situated, as follows:

### INTRODUCTION

1.      This is an action by and on behalf of current and former Drivers ("Uber Drivers") for Uber Technologies, Inc., a Delaware Corporation, and Rasier, LLC, a Delaware Limited Liability Company ("Defendants" or "Uber") who are or were employed by Uber in the State of Oklahoma as "Independent Transportation Providers."

2.      Uber, a company valued at more than $50 billion, has and continues to take unfair advantage of its financially struggling Uber Drivers by terming them "Independent Transportation Providers."  Only in the counterfactual world could Uber Drivers be considered "independent." Uber Drivers lack discretion in the performance of their employment relationship with Uber, and have no independence apart from Uber in performing their employment with Uber.

3.      Uber Drivers are able to secure fares only through Uber's mobile application, which governs every aspect of Uber Drivers' transportation services for Uber. When Uber restricts a Driver's access to Uber's mobile application, Uber effectively terminates the Driver, as the Driver is unable to work for Uber or Uber's users. Uber's misclassification of its Drivers as non-employees of the company has resulted in Uber Drivers' inability to earn minimum wage.

4.      Plaintiff alleges that he and other Uber Drivers are employees, and as employees, are entitled to basic wage protections such as expense reimbursement, overtime pay, rest- and meal-breaks, and other benefits that attach to employees that do not likewise attach to independent contractors. Uber misclassifies its drivers as independent contractors to evade these and other protections of Oklahoma law as well as the Fair Labor Standards Act.

5.      Moreover, Uber intentionally misrepresents to the public how it compensates its Drivers so that it can retain a disproportionate percentage of the fares generated by Uber Drivers. Uber markets its rides as gratuity-included, but Uber does not remit the gratuity (or an amount in-kind) to Uber Drivers. Uber effectively takes the tips. To worsen the reality for these Drivers, Plaintiff and members of the putative class finance all expenses related to their employment with Uber (*e.g.,* gas, cost of insurance, deductibles, and vehicle maintenance, among others).

6.      Uber also encourages its Drivers to lie to the public:



7.     As Uber's employees, Plaintiff and the class he seeks to represent are owed fundamental wage protections that Oklahoma wage and hour laws as well as the Fair Labor Standards Act afford Oklahoma employees. Plaintiff seeks damages and other appropriate relief on behalf of himself and other similarly situated aggrieved individuals who have worked for or who are currently working for Defendants.

## PARTIES

### Plaintiff

8.      Plaintiff KEVIN BRADSHAW is a citizen of the State of Oklahoma and a

resident of Canadian County. Plaintiff currently works for Uber as an Uber driver.

### Defendants

9.      Defendant UBER TECHNOLOGIES, INC. is a Delaware Corporation

headquartered in San Francisco, California. Uber owns and operates the Uber ride

sharing service and is authorized to conduct its business and does conduct its business

throughout the State of Oklahoma.

10.      Defendant RASIER, LLC, a subsidiary of Uber, is a Delaware Limited

Liability Company. It is authorized to conduct business and does conduct business

throughout the State of Oklahoma.

11.      Each of the Defendant JOHN DOES 1 - 10 is the agent, servant, partner,

joint-venturer, coventurer, principal, director, officer, manager, employee, or shareholder

of one or more of its co-defendant(s) who aided, abetted, controlled, and directed or

conspired with and acted in furtherance of said conspiracy with one or more of its

codefendant(s) in said co-defendant(s) performance of the acts and omissions described

below. Plaintiff names each of these Doe Defendants by fictitious names because

Plaintiff does not know these Defendants' actual identities and capacities. Despite

reasonable efforts, Plaintiff has not been able to ascertain the identity of John Does 1-10.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, and the parties are diverse, because Plaintiff is a citizen of the State of Oklahoma and Defendants are citizens of the State of Delaware.

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because the aggregate claims of the Class (as defined below) exceed the sum or value of $5,000,000.00, there is minimal diversity of citizenship between Plaintiff and Defendants, and the class consists of more than 100 members.

14.     This Court has personal jurisdiction over Defendants because Defendants intentionally avail themselves of the rights and privileges of conducting business in Oklahoma and Defendants have continuous and systematic contacts with the State of Oklahoma.

15.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because the state law claims are so closely related to the claims over which the Court has original subject matter jurisdiction that the state law claims form part of the same case or controversy.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 as many of the events and conduct giving rise to the claims occurred in this District, and because Defendants:

    a.     are authorized to conduct business in this District and have intentionally availed himself of the laws and markets within this District through the promotion, marketing, distribution, and sale of their product in this District;

b.      do considerable business in this District; and

c.      are subject to personal jurisdiction of this District.

17.    Plaintiff allege on information and belief that each Defendant acted in all manner relevant to this action as the agent of the other Defendant, carried out joint business plans and operations, and the acts and omissions of each Defendant are legally attributable to the other Defendant.

## FACTUAL ALLEGATIONS

18.    Defendants employ(ed) Plaintiff and members of the Class, exercised control over their wages, their hours, and their working conditions.

19.    Defendants regulate every aspect of Uber Drivers' job performance.

20.    As with other employers, Defendants required Plaintiff and Uber Drivers to submit to background checks, and to disclose banking information and residence, as well as social security numbers.

21.    Uber requires Plaintiff and Uber Drivers to register their cars with Uber and the vehicles cannot be more than ten years old.

22.    Uber Drivers do not pay Defendants to use Defendants' intellectual property, the mobile application. Uber Drivers do not, in the strictest sense, pay Uber a fee as consideration for use of Uber's mobile application.

23.    Rather, Defendants compensate their Uber Drivers based upon the employment arrangement that Uber unilaterally imposes upon its Drivers, as with any employment-based business model.

24.     Uber Drivers are not engaged in a business distinct from Uber's business. The Uber application ensures this. Through the application, Uber controls and directly manages Uber's entire transportation service, critically, inclusive of its Drivers.

25.     Plaintiff's and Uber Drivers' ability to earn income depends solely on Uber and not in any way on an Uber Driver's particular skill or acumen, or on any managerial or other discretionary job skill.

**<u>Plaintiff Kevin Bradshaw</u>**

26.     Plaintiff is a retired Oklahoma State Trooper.

27.     In February of 2014, Plaintiff began working for UberX. He is still currently employed as an Uber Driver.

28.     On average, Plaintiff drives thirty (30) hours each week and Uber compensates him on a weekly basis.

29.     In 2015, Plaintiff drove 40,000 miles. He grossed $23,872.00, but after paying his employment related expenses, which using the federal rate of 57.5 cents per mile, were $23,000, Plaintiff netted only $872.00 for the year, even though he worked 1,500 hours that year. In other words, he made just 58 cents per hour. In addition, the $23,000 for expenses did not include car washes, which cost him $300 per year, as well as satellite radio, which cost him $200 per year.

30.     Currently, Oklahoma minimum wage is $7.25.

31.     When Plaintiff first started, after Uber retained its portion of the fare but before paying his employment related expenses, Plaintiff earned between $500 and $600

per week. Plaintiff's expenses, including gas, insurance, lease payments, and car repairs, were approximately 30% of any amount earned ($150 to $180 each week).

32.     For some time during his employment, Mr. Bradshaw worked in excess of 50 to 60 hours a week. At all times, Uber failed to pay overtime compensation.

33.     Plaintiff worked many periods where he was not properly paid overtime ($7.25 x 1.5 = $10.88) for working more than 40 hours in a week.

34.     For example, during the 7-day period ending May 8, 2014, Plaintiff earned $301.92 and was logged on to the Uber application (*i.e.*, he was either in or next to his car, in his work clothes, on-call, waiting for Uber to send him a ride request) and working for approximately 50 hours. Plaintiff should have made ($7.25 x 40) + ($10.88 x 10) = $398.80. When his $100 of work-related expenses is taken into account, Plaintiff's hourly wage is $4.04.

35.     During the 7-day period ending May 15, 2014, Plaintiff earned $301.00 and was logged on to the Uber application (*i.e.*, he was either in or next to his car, in his work clothes, on-call, waiting for Uber to send him a ride request) and working for approximately 50 hours. Plaintiff should have made ($7.25 x 40) + ($10.88 x 10) = $398.80. When his $100 of work-related expenses is taken into account, Plaintiff's hourly wage is $4.02.

36.     Uber directed Plaintiff to log on to the application and go on-duty only when he is in his vehicle and ready, willing, and able to accept an Uber dispatch.

37.     Because Uber told Plaintiff to remain in his car while logged on to the application, he could receive 10-20 or more ride requests per day, and failing to accept

90% of ride requests results in deactivation and/or termination, Plaintiff was unable to effectively use waiting time while logged on to the application for his own purposes. Periods of inactivity are unpredictable (*i.e.*, an assignment could come at any moment) and usually of short duration. Drivers must be in position to respond quickly to requests. If they don't, Uber could deactivate or even fire them.

38.    Moreover, if Plaintiff refused to take 3 fares in a row, Uber would deactivate his account—essentially firing him for refusing to accept a fare. This means that he had to accept fares no matter the destination or the rating of the passenger.

39.    As a result, Plaintiff and other Uber Drivers are forced to remain in their vehicles at all times while logged on to the application and must also remain in their work clothes so they are ready to immediately respond when a ride request comes in. They must also keep an eye on their mobile phone to ensure that they are not missing a request. Under such conditions, Uber Drivers cannot use waiting time effectively for their own purposes.

40.    Uber Drivers' wait time while logged on to the application is primarily spent for Uber's benefit—so that Uber can provide speedy service for passengers. Moreover, when a potential passenger logs in to the app they are shown a map with all the logged in Uber drivers in their vicinity. When Plaintiff is logged in to the Uber app, Uber presents to customers that he is available to drive immediately. Not only does this practice benefit Uber, by presenting to passengers that there are cars available, it also prevents Plaintiff from performing any other activities while logged in, as he expected to be able to pick up passengers immediately.

41.    That is why Uber punishes drivers who fail to immediately respond to

driver requests and those drivers who do not accept at least 90% of such requests. By rejecting a ride request, an Uber Driver runs the substantial risk of being locked out of the Uber app and terminated. Uber reinforces this message frequently: Uber Drivers receive consistent instruction by way of mass e-mails reminding them that not accepting trips would lead to being locked out of the app.

42.     Since it is impossible to predict when it would be necessary for an Uber Driver  to resume his or her work duties, there is no way Uber could definitely inform the Driver in advance that he or she could leave the job and not return until a definitely specified hour had arrived. This makes it impossible for Uber Drivers to do personal activities during the waiting time while they are logged on to the Uber application.

43.     While logged in, Drivers must remain free and available in case a ride request comes in, in order to avoid needing to reject a request and the negative consequences that may follow.

44.     The restrictions imposed by Uber while Plaintiff was logged on to the application are so onerous as to prevent him from effectively using the time for personal pursuits. In addition to being tied to his car, ride requests come in so unpredictably and frequently that Plaintiff cannot make effective use of the time spent while logged on to the application. Defendants' requirements are simply too cumbersome so that, while Plaintiff is logged on to the application, his ability to do personal activities is usually outright prevented and is at all times at least seriously inhibited.

45.     The conditions placed on Plaintiff's activities were so restrictive—*e.g.*, Uber required him to be in his car and ready to accept a ride request—that he could not

use time logged on to the app effectively for personal pursuits.

46.     While logged on to the application, Plaintiff had to remain vigilant and continually monitor his phone (Plaintiff faced the prospect of deactivation for missing requests), which is cumbersome, and remain alert because a request could come any second.

47.     Being logged on to the app is indispensable to the principal activity of work. Without being logged on, there's no way to get a ride request and Uber cannot service its clients.

48.     Having Plaintiff and Class members logged on to the app and ready to go provided Uber with flexibility in assigning rides and ensured that it could quickly respond to passenger requests, thus furthering Uber's business objectives of providing speedy service (an integral and indispensable part of Uber's business).

49.     The terms and conditions of Plaintiff's employment have changed drastically since he first was hired by Uber. The changes were instituted by Uber, without any input from Plaintiff or other drivers.

50.     Initially, Plaintiff and other drivers earned $1.50 per mile. Now, he and other Uber Drivers earn only .70 cents per mile. Throughout his employment, Plaintiff has been subject to several price reductions implemented at the sole discretion of Uber.

51.     Uber's own records show that Mr. Bradshaw makes less than minimum wage.



**Tax summary for the period 2015**

KEVIN BRADSHAW P2P

Many of the items listed below may be deductible; please consult with an
independent tax advisor for more guidance.

**1099-K BREAKDOWN** [1]

| | |
|---|---|
| Gross Fares (Uber Fee included) [1] | USD 23871.89 |
| Tolls | USD 62.55 |
| Split Fare Fee | USD 17.50 |
| Safe Rides Fee | USD 2365.00 |
| Miscellaneous (fare) | USD 207.25 |
| **TOTAL** | **USD 26524.19** |

**1099-MISC BREAKDOWN** [2]

| | |
|---|---|
| Miscellaneous (other) | USD 0.03 |
| Referral / Incentive | USD 1004.57 |
| **TOTAL** | **USD 1004.60** |

**OTHER POTENTIAL DEDUCTIONS**

| | |
|---|---|
| Uber Service Fee | USD 4774.42 |
| Device Subscription | USD 545.00 |
| On Trip Mileage [3] | 13902 mi. |

[1] Gross fares are calculated as base + time + distance (this includes Uber Service Fee).

[2] If the Total amount in this section is over $600 you will receive an official 1099-MISC Form. If it is under $600 you will not receive an official 1099-MISC Form.

[3] On-trip mileage only. Additional mileage may be deductible.

Items in **bold** may be deductible. Check with a tax professional to learn more.

Uber is a technology company with a proprietary technology platform and does not provide tax advice.

Need help filing? Please visit Uber.com/Intuit or Uber.com/HRBlock or any other third party tax advisor should you require additional assistance with deductions and filing taxes.

52.     At first, Plaintiff was permitted to take whatever fares he chose; then, Uber declared that he would be deactivated if he refused a certain number of fares. Now, if Plaintiff refuses to take 3 fares in a row, Uber will deactivate his account – essentially firing him for refusing to accept a fare. This means that he has to accept fares no matter the destination or the rating of the passenger.

53.     Because he cannot reject a fare if he feels threatened or in fear of his safety, his workplace is not safe.

54.     Uber also exerts control over Plaintiff's hours. For example, Plaintiff may receive a request to drive to Stillwater, OK, 70 miles from Oklahoma City, even when he wants to stop working within the hour.

55. After driving approximately 5,000 fares, Plaintiff maintains a 4.86/5 rating.

56.     On December 11, 2015, Mr. Bradshaw opted out of Uber's December 11, 2015 agreement, which contained an arbitration clause.

**<u>Uber Profits by Deceiving Consumers and Drivers.</u>**

57.     At first, Uber deducted a $1 "safe ride" fee from each fare, which was allegedly used to pay for background checks, driver safety education, and development of safety features in its mobile application – an expense that Uber, the employer, should pay.

58.     Several months ago, Uber was penalized for using the term "safe ride" fee. As of February 2016, pursuant to a lawsuit, Uber is now obligated to return $28.5 million of the safe ride fee to the riders. The fee is now called a "booking fee" and has increased to $1.80 – so the fine has effectively been passed on to the drivers.

59.     Uber misled Plaintiff as to the amount of income that he can earn driving for Uber. Uber told Plaintiff that drivers can earn $2,000 a week by driving for Uber. Plaintiff did not earn the guaranteed hourly pay that Uber promised, regardless of his working more than a 40-hour week.



60.     Even if an Uber Driver could earn $2,000 a week, the advertisement and offer is deceptive and misleading because in reality, as evident from Plaintiff's experience, after expenses and other costs improperly borne by Plaintiff, Uber's Drivers make less than Oklahoma minimum wage, which is $7.25 an hour.

61.     Moreover, Plaintiff and Uber Drivers do not receive (in-kind or otherwise) a fare gratuity.

62.     Uber markets the rides in a manner that causes a reasonable belief that its Drivers are well compensated, and that as such, there's no need to tip.   Uber misleadingly states that gratuity is included in the total cost of the fare and that there is no need to tip the Uber Driver:

## DO I NEED TO TIP MY DRIVER?

You don't need cash when you ride with Uber. Once you arrive at your destination, your fare is automatically charged to your credit card on file – there's no need to tip.

63.     Uber also instructs its Drivers to decline acceptance of a gratuity.

64.     Uber intentionally misrepresented that gratuity was included in the cost of fares and instructed passengers not to leave a tip in addition to the amount of the fare.

65.     Due to Uber's "there's no need to tip" mandate, Plaintiff and Uber Drivers have sustained damages in the amount of gratuity that they would have received (even if in-kind) but for Uber's misrepresentation.

**Uber's Profit Model is Based Upon Misclassifying Drivers as Independent Contractors.**

66.    Uber uniformly misclassifies its drivers, including Plaintiff, as independent contractors when they should be classified as employees.

67.    Uber is deeply involved in marketing its transportation services, qualifying and selecting Uber Drivers, regulating and monitoring their performance (including disciplining or terminating those who fail to meet its employment standards), and fare setting.

68.    Uber exercises absolute control over the qualification and selection of its Drivers. Before driving for Uber, applicants must complete Uber's application process, including background checks.

69.    Uber controls all work aspects of its Uber Drivers, including Plaintiffs, concerning the manner, methods, and means of their provision of transportation services for Uber. For example, upon signing an agreement to work for Uber, Uber required Plaintiff to watch a video demonstrating how Uber requires them to interact with passengers. He also had to take a test based on the video. Plaintiff was also instructed on the Uber requirements for picking up customers. Uber retains all necessary control over Plaintiff's and Uber Drivers' performance.

70.    Uber monitors Plaintiff and Uber Drivers to ensure compliance with Uber's quality control standards. Uber requires all Drivers, including Plaintiff, to maintain an average customer star evaluation of at least 4.6 out of a possible 5 stars. Requirements on how to improve a star rating are given to Uber Drivers that fall below this average in any given week. If an Uber Driver fails to maintain an average customer rating of 4.6, Uber gives the Driver 30 days to raise her rating within the required threshold.  If the Uber

Driver does not do so, Uber terminates that Driver's employment with Uber by deactivating the Driver's ability to use the application to pick up customers, and thus to continue to work.  Uber Drivers must drive one fare a month or be deactivated.

71.     Uber also unilaterally sets the fares—with no negotiation or input from Plaintiff— for all rides, and Drivers are required to charge the cost determined solely by Uber. Uber bills customers for the entire amount before remitting a percentage of the payment to Uber Drivers.  Uber Drivers are paid by Uber.

72.     Uber claims a proprietary interest in its passengers, which further demonstrates that Uber acts as much more than an intermediary between passengers and Drivers. For instance, Uber prohibits its Drivers from answering rider queries about booking future rides outside the Uber application, or from otherwise soliciting Uber riders.

73.     As a result of the intentional misclassification of its employees, Uber failed to provide Plaintiff and other similarly aggrieved driver employees with itemized wage statements, minimum wages, and reimbursement for necessary expenses (*e.g.*, gas, tolls, car repairs, and lease payments). Uber also failed to keep accurate payroll records evidencing Plaintiffs' and other drivers' hours worked and wages paid and unlawfully retained gratuities owed to Plaintiff and other drivers, despite representing to customers and its drivers that gratuity is included in the total cost of the service. Uber also fails to pay into any insurance fund, including Social Security, disability, and unemployment insurance.

## CLASS ALLEGATIONS

74.     Plaintiff commences this action as a class action pursuant to Rule 23 of the

Federal Rules of Civil Procedure on behalf of:

> All Uber Driver persons who have driven and/or continue to drive for Uber
> within the State of Oklahoma from 2013 and continuing.

75.     Subject to additional information obtained through further investigation and

discovery, the foregoing definition of the Class may be expanded or narrowed by

amendment or amended complaint. Excluded from the Class are Defendants and its

affiliates, parents, subsidiaries, employees, officers, agents, and directors; government

entities or agencies, its affiliates, employees, officers, agents, and directors in their

governmental capacities; any judicial officer presiding over this matter and the members

of their immediate families and judicial staff; and class counsel.

76.     **Numerosity**: The proposed Class is so numerous that a joinder of all

members is impracticable, and the disposition of their claims as a class will benefit the

parties and the court. The precise number of such persons is unknown as the data

required to calculate that number is presently within the sole possession, custody, or

control of Defendants. Upon information and belief, there are thousands of Uber Drivers

in the State of Oklahoma, and thus in the proposed Class.

77.     **Commonality**: There are questions of law and fact common to the Class

that predominate over any questions affecting only individual Class members, including

but not limited to:

a.      The policies, programs, practices, procedures, and protocols of Defendants concerning or relating to the Class members' actual and substantive work and job duties, their titles notwithstanding;

b.      Whether Defendants violated the Oklahoma Minimum Wage Act by their policies, practices, and procedures concerning or relating to minimum wage payments for the Class members;

c.      Whether a gratuity is included in the total fare for Class members' services;

d.      Whether Defendants were and are required to distribute the total proceeds of those gratuities to the Class members;

e.      Whether Class members have suffered damages based upon Uber's representation to customers that there is no need to tip the drivers;

f.      Whether Defendants improperly classified Class members as independent contractors rather than employees;

g.      Whether Class members have been required to pay the expenses of their employment with Uber and whether Uber is required to compensate members of the Class for those expenses;

h.      The proper measure of damages and the proper measure of restitution recoverable by Class members; and

i.      Additional common questions of law and fact as developed during the discovery phase of this litigation.

78.     **Typicality**: Plaintiff's claims are typical of the claims of the Class, as such claims could be alleged by any member of the Class, and the relief Plaintiff seek is typical of the relief that Class members seek. All of the Class members were subject to the same pattern and practice of Defendants as alleged herein. Defendants' corporate-wide policies and practices affected all Class members similarly, and Defendants benefited from the same type of unfair and/or wrongful acts as to each Class member. Plaintiff and other Class members sustained similar losses, injuries, and damages arising from the same unlawful policies, practices and procedures of the Defendants.

79.     **Adequacy of Representation:** Plaintiff is able to fairly and adequately protect the interests of the Class and has no interests adverse to the Class. At all relevant times, Plaintiff and Class members are and have been similarly situated, have had substantially similar job requirements and pay provisions, and are and have been subjected to Defendants' decisions, policies, plans, programs, practices, procedures, protocols, routines, and rules, all culminating in willful wage and hour violations.

80.     **Superiority**: Prosecution of separate actions by individual members of the Class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the Class, establishing incompatible standards of conduct for Defendants and resulting in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. The losses, injuries, and damages are small as relevant to a class action analysis, such that without class treatment, individual action by each Class member would be cost-prohibitive.

81.     The Class members are also readily ascertainable. For purposes of notice and other purposes related to this action, their names and addresses are known to Defendants. The number and identity of the Class members are determinable from the records of Defendants.

82.     The representatives and their chosen attorneys are familiar with the subject matter of the lawsuit and have full knowledge of the allegations contained in this complaint so as to be able to assist in its prosecution. In addition, the representative's attorneys are competent in the relevant areas of the law and have sufficient experience to vigorously represent the Class. Furthermore, the resources available to counsel ensure that the litigation will not be hampered by a lack of financial capacity. Plaintiff's attorneys have sufficient financial resources and are willing to absorb the costs of the litigation.

## CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF THE OKLAHOMA STATUTES

83.     Plaintiff, on behalf of himself and the proposed class, repeats and realleges all preceding paragraphs as if fully set forth herein.

84.     Uber's treatment of Plaintiff and control exercised by Uber indicate that Plaintiff is an employee and not independent person contracting with Uber.

85.     Plaintiff allege that at first, on an average workday, he received approximately twenty ride requests through the Uber mobile application.  Now, that

number has dropped to approximately 12 on a good day. Once the request is received,

Plaintiff has an option to either "accept" or "reject" the request. Uber requires as a

condition of employment with Uber that the Drivers accept approximately ninety percent

of the requests. Accepting less than this threshold results in Uber deactivating the

Drivers' account, and therefore, preventing the driver from receiving any rider requests.





## HOW ARE ACCEPTANCE RATES CALCULATED?

Acceptance rates are calculated as a percentage of the total number of requests you accept out of those sent to you while online.

Maintaining a high acceptance rate keeps the Uber system reliable for riders and drivers. You should accept at least 80% of trip requests to retain your account status.

Please note that a rider canceling a trip will never count against your acceptance rate.

86.     Rejecting a certain number of requests will negatively impact Plaintiff's customer rating. The employment agreement terms between Uber Drivers and Defendants, updated last on December 11, 2015, contains a provision that specifically states that the Uber Drivers' "failure to accept User requests for Transportation Services while [they] are logged in to the Driver App creates a negative experience for Users of Uber's mobile application." If the customer rating falls below a 4.6, the driver faces termination from employment with Defendants, or a temporary deactivation of access to the Uber mobile application, *i.e.*, probation.



87.     Plaintiff seeks damages pursuant to Oklahoma Statutes for Uber's:

a.     failure to maintain payroll records for Driver employees pursuant to OAC 380:30-3-3(d); and

b.     failure to remit minimum wage to Driver employees in violation of Okla. Stat. Ann. Tit. 40 § 197.2, the Oklahoma Minimum Wage Act, and the Fair Labor Standards Act.

c.  In addition, as a result of Uber's foregoing violations, Plaintiff is entitled to recover liquidated damages and attorney's fees, pursuant to Okla. Stat. Ann. Tit. 40 § 165.9 as well as OAC 380:30-1-14.

## COUNT II
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

88.     Plaintiff, on behalf of himself and the proposed class, repeats and realleges all preceding paragraphs as if fully set forth herein.

89.     Uber interfered with the continuing business relationship between Drivers and fares—a separate relationship from that between either Uber and its Drivers or Uber and its riders, and one to which Uber is not a party—whereby riders would have paid gratuity to Drivers, including Plaintiffs, absent Uber's interference.

90.     Uber intentionally and maliciously interfered with Plaintiff and Drivers' enjoyment of an expectancy of tips from passengers by intentionally misrepresenting that gratuity was included in the cost of its fares.

91.     Uber has stated to customers, on its website and in marketing materials, that a gratuity is included in the total cost of the car service and that there is no need to tip the Driver.

92.     For example, up until the end of 2012, Uber's website included such statements as "There's no need to hand your driver any payment and the tip is included" and "Please thank your driver, but tip is already included." Beginning in 2013, Uber's website has stated that "there is no need to tip."

## DO I NEED TO TIP MY DRIVER?

You don't need cash when you ride with Uber. Once you arrive at your destination, your fare is automatically charged to your credit card on file – there's no need to tip.

93.     Even after the statements were apparently removed from the Uber's website at the end of 2012 that tips are included in the fare, Uber has nevertheless continued to inform passengers through marketing materials that tips are included in the fare. For example, as recently as at least April of 2015, Uber has sent promotion emails to customers, declaring that "payment is automatically charged to a credit card on file, with tip included."

94.     In addition, at various times (and at least through the end of 2012), Uber's contracts with its customers have incorporated by reference the statements and representations made on its website regarding pricing, which includes such statements as the "tip is included" in the fare. For example, Uber's contracts with its customers (at least through the end of 2012) contained such statements as: "The Company may change the fees for our Service or Software as we deem necessary for our business. We encourage you to check back at our website periodically if you are interested about how we charge for the Service of [sic] Software."

95.     However, despite Uber's representations to customers that the fare includes a gratuity (and despite Uber's contracts with customers that incorporated its pricing information on its website, including the website statements that "tip is included"), Uber drivers have not received the total proceeds of this gratuity.

96.     In reality, Uber collected gratuities and then failed to remit them to drivers.

97.     Based on its past practices of not remitting gratuities to drivers, Uber knew that it was going to retain the tips for itself when it misrepresented that tips would be passed on to its drivers.

98.     Were it not for Uber's misrepresentations regarding gratuities, riders would have left a tip for drivers as is customary in the car-service industry.

99.     Uber knew that this would be a benefit accruing to the Drivers at the time it discouraged tipping by telling passengers tipping is included in the fare and knew the interference was certain or substantially certain to occur as a result of the conduct.

100.    Uber's conduct damaged Plaintiff and other drivers.

## COUNT III
## BREACH OF CONTRACT

101.    Plaintiff, on behalf of himself and the proposed class, repeats and realleges all preceding paragraphs as if fully set forth herein.

102.    Uber has an implied in-fact contract with Plaintiff and other Drivers to remit the total proceeds of all gratuities, as well as to reimburse for expenses.

103.    Plaintiff and other Drivers are third-party beneficiaries of customers' implied contract with Uber that tips would be remitted to Drivers, the terms of which were incorporated by reference from certain advertisements or statements Uber made on various webpages. By entering into this agreement, customers intended to secure a financial benefit for Drivers, including Plaintiffs, in the form of gratuity and to act directly for the Drivers' benefit.

104.    At all times, Uber withheld and continues to withhold gratuities given by customers to Uber drivers and/or gratuities that are incorporated into the set fare. Uber has also failed to reimburse Plaintiff for their employment related expenses.

105.    Uber's conduct damaged Plaintiff and other drivers.

## COUNT IV
## UNJUST ENRICHMENT

106.    Plaintiff, on behalf of himself and the proposed class, repeats and realleges all preceding paragraphs as if fully set forth herein.

107.    Defendants unlawfully retained gratuities promised to Plaintiff and other drivers and failed to reimburse expenses.

108.    Defendants obtained these benefits from drivers by making material misrepresentations and taking advantage of them.

109.    As a result, Defendants has been unjustly enriched through their retention of a portion of the gratuities owed to the drivers.

110.    Plaintiff and the class members are entitled to restitution for their full share of the proceeds of the improperly retained gratuities.

## COUNT V
## CHOSE/THING IN ACTION

111.    Plaintiff, on behalf of himself and the proposed class, repeats and realleges all preceding paragraphs as if fully set forth herein.

112.    Uber has stated to customers, on its website and in marketing materials, that a gratuity is included in the total cost of the car service and that there is no need to

tip the Driver.

113.    For example, Uber's website included such statements as "There's no need to hand your driver any payment and the tip is included" and "Please thank your driver, but tip is already included." Uber's website has also stated that "there is no need to tip."

114.    Uber sent promotion emails to customers, declaring that "payment is automatically charged to a credit card on file, with tip included."

115.    As Uber represented, a certain percentage of each fare was gratuity. That gratuity belonged to Plaintiff and other Drivers.

116.    But Uber Drivers do not receive any such gratuity. Instead, Uber keeps their tips for itself. By informing customers that gratuity is included in the cost of its service, but then not remitting any gratuity to drivers, Uber Drivers have been deprived of payments to which they are entitled.

117.    Plaintiff and other Drivers have a superior right to possession of gratuities.

118.    Uber has refused to relinquish the tips to Plaintiff. Instead, Uber retained the tips for its own benefit without Plaintiff's permission.

119.    The gratuities were specifically earmarked for the Drivers. But Uber retained them, thereby interfering with Plaintiff's rights to his intangible personal property.

120.    Uber's conduct damaged Plaintiff and other Drivers.

## COUNT VI
## FRAUD AND/OR INTENTIONAL OR NEGLIGENT MISREPRESENTATION

121.    Plaintiff, on behalf of himself and the proposed class, repeats and realleges all preceding paragraphs as if fully set forth herein.

122.    Uber represented to Plaintiff and other Drivers that they would receive gratuities, surge fares, and cancellation fees.  Uber did not pay these monies as promised.

123.    These misrepresentations were material because they affected Plaintiff and other Drivers' decisions to continue driving for Uber.

124.    Uber knew at the time it made these misrepresentations—or, at the very least, made the misrepresentations recklessly—that it would not pass along these monies to Plaintiff and other Drivers based on its past practices of not doing so.

125.    Plaintiff and other Drivers reasonably and justifiably relied on these misrepresentations and continued to drive for Uber because Uber was his employer and the party responsible for overseeing the payment of these monies.

126.    Uber's conduct damaged Plaintiff and other Drivers.

## COUNT VII
## PROMISSORY ESTOPPEL

127.    Plaintiff, on behalf of himself and the proposed class, repeats and realleges all preceding paragraphs as if fully set forth herein.

128.    Uber promised to make certain payments, such as hourly wages, cancellation fees, and other payments, and to remit all gratuities to Plaintiff and other drivers. Instead, Uber kept this money for itself.

129.    Based on its past practices of not paying tips to drivers, Uber knew at

the time it made the promise that it was a lie.

130.    Plaintiff and other drivers relied to their detriment on Uber's promise in continuing to drive for Uber and not seeking additional tips from passengers.

131.    Plaintiff's and other Drivers' reliance was foreseeable because Uber—the entity that actually determines and pays drivers' compensation—made the false promise.

132.    Uber's conduct damaged Plaintiff and other drivers.

133.    Injustice can be avoided only by enforcing Uber's promise to remit all gratuities to Plaintiff and other drivers.

## COUNT VIII
## <u>FAIR LABOR STANDARDS ACT</u>

134.    Plaintiff, on behalf of himself and the proposed class, repeats and realleges all preceding paragraphs as if fully set forth herein.

135.    Plaintiff alleges that Defendants have required, or required Plaintiff and Uber Drivers who have driven for Uber, as part of their employment, to work without receiving the minimum wage for all hours worked, under 29 U.S.C. § 206(a), providing in pertinent part: "Every employer shall pay to each of his employees who in any work week is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the [minimum wage]."

136.    Plaintiff alleges that Defendants have required, or require Plaintiff and Uber Drivers, as part of their employment, to work without additional compensation, such as overtime pay, in excess of the forty hours per week maximum under 29 U.S.C. § 207(a)(1), which provides: "Except as otherwise provided in this section, no employer

shall employ any of his employees for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate which is not less than one and one-half times the regular rate at which he is employed."

137.    Plaintiff worked many periods where he was not properly paid overtime ($7.25 x 1.5 = $10.88) for working more than 40 hours in a week.

138.    For example, during the 7-day period ending May 8, 2014, Plaintiff earned $301.92 and was logged on to the Uber application (*i.e.*, he was either in or next to his car, in his work clothes, on-call, waiting for Uber to send him a ride request) and working for approximately 50 hours. Plaintiff should have made ($7.25 x 40) + ($10.88 x 10) = $398.80. When his $100 of work-related expenses is taken into account, Plaintiff's hourly wage is $4.04.

139.    During the 7-day period ending May 15, 2014, Plaintiff earned $301.00 and was logged on to the Uber application (*i.e.*, he was either in or next to his car, in his work clothes, on-call, waiting for Uber to send him a ride request) and working for approximately 50 hours. Plaintiff should have made ($7.25 x 40) + ($10.88 x 10) = $398.80. When his $100 of work-related expenses is taken into account, Plaintiff's hourly wage is $4.02.

140.    Uber directed Plaintiff to log on to the application and go on-duty only when he is in his vehicle and ready, willing, and able to accept an Uber dispatch.

141.    Because Uber told Plaintiff to remain in his car while logged on to the application, he could receive 10-20 or more ride requests per day, and failing to accept 90% of ride requests results in deactivation and/or termination, Plaintiff was unable to

effectively use waiting time while logged on to the application for his own purposes.
Periods of inactivity are unpredictable (*i.e.*, an assignment could come at any moment)
and usually of short duration. Drivers must be in position to respond quickly to
requests. If they don't, Uber could deactivate or even fire them.

142.   Moreover, if Plaintiff refused to take 3 fares in a row, Uber would deactivate
his account—essentially firing him for refusing to accept a fare. This means that he
had to accept fares no matter the destination or the rating of the passenger.

143.   As a result, Plaintiff and other Uber Drivers are forced to remain in their
vehicles at all times while logged on to the application and must also remain in their
work clothes so they are ready to immediately respond when a ride request comes in.
They must also keep an eye on their mobile phone to ensure that they are not missing a
request. Under such conditions, Uber Drivers cannot use waiting time effectively for
their own purposes.

144.   Uber Drivers' wait time while logged on to the application is primarily
spent for Uber's benefit—so that Uber can provide speedy service for passengers.
Moreover, when a potential passenger logs in to the app they are shown a map with all
the logged in Uber drivers in their vicinity. When Plaintiff is logged in to the Uber
app, Uber presents to customers that he is available to drive immediately. Not only
does this practice benefit Uber, by presenting to passengers that there are cars
available, it also prevents Plaintiff from performing any other activities while logged
in, as he expected to be able to pick up passengers immediately.

145.   That is why Uber punishes drivers who fail to immediately respond to
driver requests and those drivers who do not accept at least 90% of such requests. By

rejecting a ride request, an Uber Driver runs the substantial risk of being locked out of the Uber app and terminated. Uber reinforces this message frequently: Uber Drivers receive consistent instruction by way of mass e-mails reminding them that not accepting trips would lead to being locked out of the app.

146.    Since it is impossible to predict when it would be necessary for an Uber Driver  to resume his or her work duties, there is no way Uber could definitely inform the Driver in advance that he or she could leave the job and not return until a definitely specified hour had arrived. This makes it impossible for Uber Drivers to do personal activities during the waiting time while they are logged on to the Uber application.

147.    While logged in, Drivers must remain free and available in case a ride request comes in, in order to avoid needing to reject a request and the negative consequences that may follow.

148.    The restrictions imposed by Uber while Plaintiff was logged on to the application are so onerous as to prevent him from effectively using the time for personal pursuits. In addition to being tied to his car, ride requests come in so unpredictably and frequently that Plaintiff cannot make effective use of the time spent while logged on to the application. Defendants' requirements are simply too cumbersome so that, while Plaintiff is logged on to the application, his ability to do personal activities is usually outright prevented and is at all times at least seriously inhibited.

149.    The conditions placed on Plaintiff's activities were so restrictive—*e.g.*, Uber required him to be in his car and ready to accept a ride request—that he could not use time logged on to the app effectively for personal pursuits.

150.    While logged on to the application, Plaintiff had to remain vigilant and continually monitor his phone (Plaintiff faced the prospect of deactivation for missing requests), which is cumbersome, and remain alert because a request could come any second.

151.    Being logged on to the app is indispensable to the principal activity of work. Without being logged on, there's no way to get a ride request and Uber cannot service its clients.

152.    Having Plaintiff and Class members logged on to the app and ready to go provided Uber with flexibility in assigning rides and ensured that it could quickly respond to passenger requests, thus furthering Uber's business objectives of providing speedy service (an integral and indispensable part of Uber's business).

153.    Plaintiff further alleges, in accordance with 29 U.S.C. § 216, that Defendants have required and/or require Plaintiff and Uber Drivers, as part of their employment, to work without compensation for *all* hours worked, to work beyond forty hours per week without the payment of overtime compensation for such hours, and/or cause them to work at a wage less than the minimum wage, pursuant to, *inter alia*, 29 U.S.C. §§ 206 and 207(a)(1).

154.    Defendants' violations of the FLSA were willful and are ongoing. As a result of the foregoing, Plaintiff seeks judgment against Defendants for all unpaid wages, including overtime wages owed pursuant to 29 U.S.C. §§ 206 and 207, together with an

award of an additional equal amount as liquidated damages, and costs, interests,

and reasonable attorneys' fees, pursuant to, *inter alia*, 29 U.S.C. § 216(b).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the proposed

Class, requests relief against Defendants as follows:

    a.    An award of damages, including compensatory, punitive, and treble damages, in an amount to be determined at trial;

    b.    Notice to the Class of this action;

    c.    An injunction against Defendants prohibiting Defendants from continued unlawful practices, policies and patterns set forth herein;

    d.    Liquidated damages, pursuant to Oklahoma Statutes and FLSA;

    e.    Reasonable attorneys' fees and costs of this action, pursuant to Oklahoma Statutes and FLSA;

    f.    Pre-judgment and post-judgment interest as provided by law;

    g.    Declaratory relief that Plaintiff and members of the class are employees under the relevant law;

    h.    An order directing Defendants to return to Plaintiff any gratuities and any other funds wrongfully kept by Defendants; and

    i.    Such other and further relief that the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated: June 26, 2017                          Respectfully submitted,

*/s/ Paul B. Maslo*
Paul B. Maslo (admitted pro hac)
Andrew Dressel (admitted pro hac)
NAPOLI SHKOLNIK PLLC
360 Lexington Avenue, 11th Floor
New York, New York 10017
Telephone: (212) 397-1000
Fax: (646) 843-7603
Email: pmaslo@napolilaw.com
         adressel@napolilaw.com

Noble McIntyre
Jeremy Thurman
MCINTYRE LAW, P.C.
8601 South Western Avenue
Oklahoma City, OK 73139
Telephone: (405) 917-5250
Fax: (405) 917-5405
Email: Noble@McIntyreLaw.com
         Jeremy@McIntyrelaw.com


*Counsel for Kevin Bradshaw*